## Supreme Court of Errors of the State of Connecticut.

### *April,* 1887.

## STATE *v.* GLIDDEN.*

Conspiracy.—Boycott.—Declarations of Conspirator.— Evidence.

Where all the counts of an information are evidently based upon one and the same transaction, it will be assumed by the court that it was the intention of the prosecution to charge but one offense.

---

* This case is one of very great importance and is cited whenever the question of boycotts is raised in a criminal trial. As there are necessarily in this, as in most cases taken from other States, princi-

* If two or more persons confederate and agree together to commit some crime or misdemeanor, such confederation or agreement is in itself an offense.

* The defendants proposed to threaten and use means (the boycott) to intimidate a certain publishing company to compel it, against its will, to abstain from keeping in its employ the workmen of its own choice, and to employ defendants and such persons as they should name in place of such workmen. *Held*, that such acts were within the prohibition of the (Connecticut) Session Laws of 1878, ch. 92, providing that every person who shall threaten or use any means to intimidate any person to compel him to do or to abstain from doing any act which he has a legal right to do, or shall injure or threaten to injure his property with the intent to intimidate him, shall be liable, etc.

It is a criminal offense for two or more persons corruptly and maliciously to confederate and agree together to deprive another of his liberty, or his property.

It is also a criminal offense for two or more persons to confederate together to injure other workmen by adopting means to deprive them of their employment.

The fact that a conspiracy which contemplates its carrying out through intimidation and violence has a lawful end in view,—to wit, to fix and advance the wages of workmen, and further their material interests,—is no legal excuse for the criminal means employed.

The attempt of defendants to injure not merely the boycotted publishing company but its innocent patrons by involving them in embarrassment and possible ruin by means of the boycott merely for the purpose of furthering their cause and controversy, in which said patrons were not concerned, must be regarded *prima facie* as malicious and corrupt.

The meaning and history of the word "boycott," considered.

The declarations of one K., who was one of the conspirators, although not a defendant, made during the continuance of the conspiracy and for the purpose on the part of the conspirators of carrying the same into full effect,—that they would do the same as they had done in the prior boycott of another party, and appeal to the merchants to take their advertisements out of the publishing company's paper, and appeal to subscribers; that if

ples of law which are not applicable to New York, the paragraphs in the head-notes containing these principles, which are necessarily involved in the discussion of the case, but which do not apply to our State, are marked with an asterisk.

they had another battle, the publishing company would have to pay the expenses of the boycott,—were admitted in evidence against the objections of defendants. These declarations were made to one S., a workman in the publishing company's office, in an interview between that workman and two of the defendants, who had some time before tried to induce S. to join the conspiracy. *Held*, that the declarations in question, following efforts of G. and K. to win over S., may well be regarded as supplementary to those efforts, and so were acts in the prosecution of the objects of the conspiracy, and, as such, were admissible against defendants.

To prove that G., one of the defendants, distributed circulars requesting persons to boycott the publishing company, the prosecution, after proving that G. had been· active in attempting to induce the public not to patronize the newspaper of the publishing company, proved by a witness that on the most frequented street in New Haven, in the evening, he saw two persons passing, one of whom was G., walking up and down said street in company, and close together, and that from between them copies of a circular were from time to time dropped on the sidewalk. *Held*, that this was sufficient evidence from which the jury might well find that G. distributed the circular, even though the witness could not swear which of the two men dropped it.

The circular itself was in large letters, as follows : " A WORD TO THE WISE IS SUFFICIENT. BOYCOTT THE JOURNAL AND COURIER." It was admitted in evidence, against the objection of defendant, after the reception of the evidence above given as to its being dropped on the sidewalk. *Held*, no error.

The defendants in the present case frequently referred to a prior boycott which they had instituted against another newspaper, the *News*, and proclaimed their purpose to pursue in the present boycott the same general policy, including a demand that the expenses of the boycott should be paid by the publishing company. *Held*, that it was admissible to show what had been done in the prior boycott, that by frequent reference to it as a precedent defendants had made the same to some extent relevant and material.

The prosecution proved that during the prior boycott an agreement that the *News* should pay the expense of the boycott was submitted for approval to some of the defendants by one F.; but that defendants in the present case had opposed presenting that demand to the *News*. The witness who testified to this

interview with defendants was asked on cross-examination as to statements in regard to said agreement by G., one of the defendants, at a subsequent interview. The prosecution had in no way referred to the latter interview. *Held*, that what defendant G. then said was inadmissible.

A witness, one of the conspirators but not a defendant, refused to state whether he had printed certain circulars used by the defendants, on the ground that his admission would incriminate himself. The testimony of a judge was then offered against the objection of defendant to prove that before him at another court, and on trial of another case, the witness had testified that he had printed such circulars. The objection of defendants was apparently that the testimony as to the declarations of the witness was not admissible as the testimony of a co-conspirator. *Held*, that the testimony was admissible, being offered, not to prove the declarations of co-conspirator, but the fact that the alleged co-conspirator had printed the circulars.

Statements of members of the labor union by whom the boycott was inaugurated and prosecuted, made in the presence of one of the defendants, that they were paying money to support the boycott, and that it would be paid for by the publishing company, such testimony having been heard by one of the defendants and he not making any reply thereto, is admissible to show that that defendant understood and intended that the publishing company would be required to pay the expenses of the boycott.

Information in the Superior Court in New Haven County for a conspiracy against Benjamin F. Glidden, David Mc-Namara, Thomas Mulcahy, and Frederick Bushe.

The facts are fully stated in the information as set forth in the opinion of the court.

A demurrer interposed to the information having been overruled and a trial had, there was a conviction, from which the present appeal was taken by defendants.

*J. T. Platt*, *T. H. Russell*, and *J. T. Moran*, for defendants, appellants.

*J. W. Alling*, for the State.

CARPENTER, J.—Information for a conspiracy. Demurrer to the information overruled. Plea, not guilty. Verdict, guilty. The defendants appealed.

The appeal raises a question as to the sufficiency of the information, and also some questions of evidence. Is an offense sufficiently charged in the information? There are six counts. The verdict was taken separately as to each defendant on each count. Three of the defendants were found guilty on all the counts, and one was found not guilty.

The first count in substance charges the object of the conspiracy to have been (1) to compel the Carrington Publishing Company, against its will, to discharge its workmen, and to employ such persons as the defendants and their associates should name; and (2) to injure and oppress the workmen then in the employ of said corporation, by depriving them of their said employment. That the means to be employed to accomplish said purposes were to demand the discharge of said workmen, and the employment of the defendants, etc., and, if such demand was not complied with within forty-eight hours, the defendants and their associates were to represent to, and threaten said corporation, that there were associated in combination with the defendants, the members, in said city, of divers secret and large labor unions, to the number of 1,000 persons, who could, by the fear and terror to be created by the secrecy and discipline of this said secret organization, and by the large number of the members thereof, and by the to-be threatened and concerted withdrawal of the patronage of the defendants and their associates, and by stopping and promoting the patronage of others, through threats and intimidations, and by other unlawful means, would so control the persons dealing with said corporation as to compel them, though against their will, to cease doing business with said corporation; and who could and would boycott the business of said corporation, and so would substantially injure and destroy its business, and prevent the same from being carried on, unless

said corporation would discharge said workmen, and employ the defendants, etc. And, if said corporation did not yield to said demands, the defendants and their associates would, in like manner, represent to and threaten all persons dealing with said corporation; and that they could and would so control, boycott, and injure the business customers of such persons as through fear, etc., and by the to-be threatened and concerted withdrawal of the patronage of the defendants, etc., and by stopping and preventing the patronage of others through threats and intimidations, and by other unlawful means, to compel such customers, though against their will, to cease doing business with the subscribers and others, patrons of said corporation; and that the defendants would not give up or abandon said proceeding to injure the business of said corporation until they had either destroyed and prevented said business from being carried on, or until said corporation should comply with their said demands and should further pay to the defendants a large sum of money, —viz., $500,—to defray the expenses of the defendants and their said associates in so carrying out said conspiracy. It is then charged that such demand was made on the corporation, and was not complied with; that, therefore, the agreed representations and threats were made to said corporation; that, said corporation still refusing to yield, the agreed representations and threats were made to the subscribers and patrons of said corporation, etc.

The second count alleges the object of the conspiracy to have been to injure and oppress, and to reduce to beggary and want certain employes of said corporation, naming them, and to deprive them of their said employment, and to prevent them from getting employment elsewhere, and to force said corporation, against its will, to discharge said persons, etc. The means of accomplishing said purposes are then set out, and are similar to those set out in the first count.

In the third count, the object, as alleged, was, by indirect means, to impoverish the Carrington Publishing Company,

a corporation engaged in publishing a daily newspaper called " The Journal and Courier," a newspaper and advertising medium ; and the means agreed upon was by lessening and destroying the circulation of said newspaper, and by inducing, by threats and persuasions, subscribers, advertisers, and others from further patronizing said newspaper, etc.

The fourth count is like the third, with the additional allegation that the defendants induced one person to discontinue his subscription to said newspaper, and attempted to induce sundry other persons from advertising therein, and that the corporation was greatly damaged.

The fifth count alleges that the defendants conspired together to impoverish one Alfred W. Gleason, to reduce him to want and beggary, and to hinder and deprive him from using and exercising his trade and business as a printer in the employ of said corporation, by inducing and causing, by threats and persuasions, said corporation to discharge said Gleason from its employ, and thereafter to refrain from employing him, etc.

The sixth count is like the fifth, except that two other persons are named with Gleason as the persons to be injured, etc.

We assume that it was the intention of the attorney to charge but one offense, as all the counts are manifestly based upon one and the same transaction. The first count seems to embrace the substance of all the others, so that we have no occasion further to consider the different counts separately.

We will next inquire what is a criminal conspiracy. We will not attempt to formulate in a single sentence a definition which will embrace every case of conspiracy which the law will regard as criminal. Such a definition will of necessity embrace, not only a great variety of subjects, but also many distinct and independent classes of subjects. We shall, therefore, have a better understanding of the matter if we consider each part of such a definition by itself, each part having reference to a class of objects or purposes which may form the subject of a criminal conspiracy.

In the first place, it seems to be generally conceded that, if two or more persons confederate and agree together to commit some crime or misdemeanor, such confederation or agreement is itself an offense. Here we are hardly on debatable ground, and here we will pause and apply this partial definition to this information. A statute passed in 1878 provides that "every person who shall threaten or use any means to intimidate any person, to compel such person, against his will, to do or abstain from doing any act which such person has a legal right to do, or shall persistently follow such person in a disorderly manner, or injure or threten to injure his property, with intent to intimidate him, shall, upon conviction, be liable to a fine not exceeding $100, or imprisonment in the county jail six months." This statute was unquestionably designed as a substitute for the act of 1877, which doubtless had its origin in the apprehension which prevailed throughout the country at the time of and soon after the trouble on the Pennsylvania Railroad, during which there was such an immense destruction of property at Pittsburgh. The operation of that act was limited to railroad, gas, and telegraph companies. The act of 1878 removed the limitation, and was designed to protect all persons, natural or artificial, employers or employes, in the management and control of their own business. It simply extended the remedy. We cannot, therefore, limit the act of 1878 to subjects embraced in the act of 1877 without doing violence to the manifest intention of the legislature.

Do the acts which it is alleged the defendants conspired to do, fall within the prohibition of the act of 1878 ? They propose to threaten and use means (the boycott) to intimidate the Carrington Publishing Company, to compel it, against its will, to abstain from doing an act (to keep in its employ the workmen of its own choice) which it had a legal right to do, and to do an act (employ the defendants, and such persons as they should name) which it had a legal right to abstain from doing. There can be but one answer to the

question. The acts proposed are clearly prohibited by the statute.

We might perhaps stop here, but the arguments of the case took a much wider range; and the case itself will justify, and the times in which we live seem to require, a more extended examination of the subject. Conspiracies against the government, and conspiracies to hinder or obstruct the administration of justice, which are also regarded as criminal conspiracies, need not be considered in this case. It has often been said that a conspiracy to effect an unlawful purpose, or a lawful purpose by unlawful means, is an offense. But this is said to be a limitation, rather than a definition. It certainly lacks definiteness. Many acts are said to be unlawful which would not be the subject of a criminal conspiracy. Other acts are unlawful because they are in violation of the criminal law, or of some penal statute. If the ends or the means are criminal in themselves, or contrary to some penal statute, the conspiracy is clearly an offense. Between these two extremes a great variety of cases may arise, many of which ought not to be regarded as criminal. Suppose two or more boys, for instance, agree to go upon another's land. The proposed act is or may be a trespass, and therefore unlawful. If they do not go, no harm is done. If they do go, they are or may be liable civilly, but no one would seriously contend that in either case they would be liable criminally, for the conspiracy. But suppose two or more conspire unjustly and wrongfully to deprive another of his liberty or property. Then, as we shall hereafter see, the criminal law may take cognizance of the act. Of course, it is difficult, if not impossible, to define accurately and clearly in advance what would and what would not be an offense. Hence the difficulty of regulating by statute in all cases the law of criminal conspiracy. But this difficulty is not confined to these cases. There are other offenses at common law that are not defined by any statute. The statute prescribes a penalty for such cases, without attempting to define in advance the acts

which shall constitute an offense. It is left for the court to determine, in each particular case, whether it is or is not an offense. For instance, it has been held an offense at common law for a prisoner to escape from jail, and for one to solicit another to commit the crime of adultery. Neither of those acts are forbidden by statute; yet it was held in each case, after the act, that it was an offense. The supposed hardship is only apparent; it is not real. . The danger that an innocent man will be punished criminally for a conspiracy because the act was not forbidden by the written law is very small. It is hardly supposable that prosecutions will be instituted and sustained by the court and jury unless the acts done or contemplated are clearly illegal and morally wrong; so much so'as to leave little or no room for a right-minded man to doubt. If we are to attempt to give a rule applicable to this branch of the subject, we should say that it is a criminal offense for two or more persons corruptly and maliciously to confederate and agree together to deprive another of his liberty or his property. Such rule is proximately correct and practically just.

Now, if we look at this transaction as it appears on the face of this information, we shall be satisfied that the defendant's purpose was to deprive the Carrington Publishing Company of its liberty to carry on its business in its own way, although in doing so it interfered with no right of the defendant. The motive was a selfish one,—to gain an advantage unjustly, and at the expense of others,—and therefore the act was legally corrupt. As a means of accomplishing the purpose, the parties intended to harm the Carrington Publishing Company, and therefore it was malicious. It seems strange that in this day and this free country—a country in which law interferes so little with the liberty of the individual—that it should be necessary to announce from the bench that every man may carry on his business as he pleases, may do what he will with his own, so long as he does nothing unlawful, and acts with due regard to the rights of others; and that the occasion for such an

announcement should be, not an attempt by government to interfere with the rights of the citizen, nor by the rich and powerful to oppress the poor, but an attempt by a large body of workingmen to control, by means little, if any, better than force, the action of employers. The defendants and their associates said to the Carrington Publishing Company: " You shall discharge the men you have in your employ, and you shall hereafter employ only such men as we shall name. It is true, we have no interest in your business, we have no capital invested therein, we are in no wise responsible for its losses or failures, we are not directly benefited by its success, and we do not participate in its profits; yet we have a right to control its management, and compel you to submit to our dictation." The bare assertion of such a right is startling. The two alleged rights cannot possibly co-exist. One or the other must yield. If the defendants have the right which they claim, then all business enterprises are alike subject to their dictation. No one is safe in engaging in business, for no one knows whether his business affairs are to be directed by intelligence or ignorance,—whether law and justice will protect the business, or brute force, regardless of law, will control it; for it must be remembered, that the exercise of the power, if conceded, will by no means be confined to the matter of employing help. Upon the same principle, and for the same reasons, the right to determine what business others shall engage in, when and where it shall be carried on, etc., will be demanded, and must be conceded. The principle, if it once obtains a foot-hold, is aggressive, and is not easily checked. It thrives on what it feeds, and is insatiate in its demands. More requires more. If a large body of irresponsible men demand and receive power outside of law, over and above law, it is not to be expected that they will be satisfied with a moderate and reasonable use of it. All history proves that abuses and excesses are inevitable. The exercise of irresponsible power by men, like the taste of human blood by tigers, creates an unappeasable appetite for more. Business men have a

general understanding of their rights under the law, and have some degree of confidence that the government, through its courts, will be able to protect those rights. This confidence is the corner-stone of all business; but if their rights are such only as a secret and irresponsible organization is willing to concede to them, and will receive only such protection as such an organization is willing to give, where is that confidence which is essential to the prosperity of the country?

Again, if the alleged right is conceded to the defendants a similar right must be conceded to the promoters of the Carrington Publishing Company, aud those with whom they may associate. Otherwise, all men are not equal before the law. It logically follows that they, in turn, may control the business matters of the defendants, may determine what trade or occupation they may follow, whether to work in this establishment or in that, or in none at all. Obviously, such conflicting claims, in the absence of law, can lead to but one result, and that will be determined by brute force. It would be an instance of the survival, not necessarily of the fittest, but of the strongest. That would be subversive, not only of all business, but also of law, and of the government itself. The end would be anarchy, pure and simple.

Once more. Suppose the government should assert the right in the same manner to regulate and control the business affairs of the Carrington Publishing Company and other business enterprises,—how long would the people submit to it? And yet the exercise of such a power by government would be far more tolerable than its exercise would be by secret organizations, however wise and intelligent such organizations may be; for government is established by the people and for the people, and is responsible to all the people. If it abuses its power, the people have the remedy in their own hands; but if a secret organization, in the management of which the people at large have no voice, abuses its power, and is not amenable to law, where is the remedy?

It is further alleged that another purpose of the defendants was to injure and oppress John E. Skinner and seven other workmen of the Carrington Publishing Company, by depriving them of their employment. What we have already said applies equally well to this purpose of the defendants. The workmen named have just as good a right to work for the corporation as the defendants have, and their right is entitled to the same consideration and the same protection. Then there are these further considerations: It is a combination, not against capital nor employers, but against fellow-workmen,—men whose earnings are comparatively small, and who presumably need all their earnings for the support of themselves and their families. They are ordinarily poor men, and men whose entire capital consists in their trade and time. It is proposed wantonly to deprive them of a livelihood, and practically of all means of support. If a capitalist is driven from his business, he has other resources, but the poor mechanic, driven from his employment, and, as is often the case, deprived of employment elsewhere, is compelled to see his loved ones suffer or depend upon charity.

It is also a combination of many to impoverish and oppress a few. The weaker party needs and must receive the protection of the law. If, in any case, it is criminal for many to combine to do what any one may lawfully do singly, it would seem that this would be such a case. Numbers can accomplish what one man cannot,—evil as well as good, —and that is the reason of the combination. The law encourages combination for good, and combinations by workmen to better their condition by legitimate and fair means are commendable, and should be encouraged. But combinations for evil purposes, whether by one class of men or another, are detrimental to the public weal, and cannot be regarded with favor by the courts. But combinations for good purposes may be perverted; and, when their power is sought to be used to harm their fellow-men,—to deprive others of their just rights,—then, not the combina-

tion, but the use of it, becomes criminal. In such use, there is a large element of wantonness and malice. Any one man, or any one of several men, acting independently, is powerless; but when several combine, and direct their united energies to the accomplishment of a bad purpose, the combination is formidable. Its power for evil increases as its numbers increase. No one man can drive these workmen from their situations. Numbers, if allowed their will, may do it. The intention by one man, so long as he does nothing, is not a crime which the law will take cognizance of; and so, too, of any number of men acting separately. But when several men form the intent, and come together and agree to carry it into execution, the case is changed. The agreement is a step in the direction of accomplishing the purpose. The combination becomes dangerous, and subversive of the rights of others, and the law wisely says it was a crime. It is no answer to say the conspiracy was for a lawful purpose, to better their own condition, to fix and advance their rate of wages, and further their own material interest. It is certainly true that they had a right to such a purpose, and to use all lawful means to carry it into effect; and so a purpose to acquire property is lawful so far as it contemplates lawful means only. But if it contemplates the acquisition of money by means of murder, theft, fraud, or injustice, the end does not sanctify the means. Neither will these defendants be permitted to advance their material interests, or otherwise better their condition, by any such reprehensible means. They had a right to request the Carrington Publishing Company to discharge its workingmen and employ themselves, and to use all proper argument in support of their request. But they had not the right to say: " You shall do this, or we will ruin your business." Much less had they a right to proceed to ruin its business. In such a case, the direct and primary object must be regarded as the destruction of the business. The fact that it is designed as a means to an end,

and that end, in itself considered, a lawful one, does not divest the transaction of its criminality.

In considering the demurrer, we should not overlook the fact that it is alleged that one object of the defendants was to extort money from the Carrington Publishing Company. It must be conceded that the extortion of money, otherwise than by legal means, is unlawful in a criminal sense. But the sufficiency of this information does not depend upon that allegation. It is, therefere, unnecessary to notice it further.

Neither do we overlook the character and magnitude of this conspiracy as evidenced by the wholesale boycotting contemplated of the patrons of the Carrington Publishing Company. Perhaps no new or different principle applies to this part of the case. We cannot forbear remarking, however, that it evinces a recklessness and disregard of the rights of others seldom witnessed in business affairs. Assuming, as we do, that these defendants are honest, well-meaning men, it is difficult for us to understand how they could be willing to involve the innocent patrons of the Carrington Publishing Company in embarrassment and possible ruin, merely for the purpose of furthering their cause in a controversy in which said patrons were not concerned. *Prima facie*, such conduct must be regarded as malicious and corrupt.

We will also notice that it is alleged that the conspiracy contemplated boycotting as a means to the end sought. That word is not easily defined. It is frequently spoken of as passive merely,—a let-alone policy; a withdrawal of all business relations, intercourse, and fellowship. If that is its only meaning, it will be difficult to find anything in it criminal. We may gather some idea of its real meaning, however, by a reference to the circumstances in which the word originated. Those circumstances are thus narrated by Mr. Justin McCarthy, an Irish gentleman of learning and ability, who will be recognized as good authority. In his work entitled "England under Gladstone," he says:

" The strike was supported by a form of action, or rather inaction, which soon became historical. Captain Boycott was an Englishman, an agent of Lord Earne, and a farmer of Lough Mask, in the wild and beautiful district of Connemara. In his capacity as agent he had served notices upon Lord Earne's tenants, and the tenantry suddenly retaliated in a most unexpected way, by, in the language of schools and society, sending Captain Boycott to Coventry in a very thorough manner. The population of the region for miles round resolved not to have anything to do with him, and, as far as they could prevent it, not to allow any one else to have anything to do with him. His life appeared to be in danger; he had to claim police protection. His servants fled from him as servants flee from their masters in some plague-stricken Italian city. The awful sentence of excommunication could hardly have rendered him more hopelessly alone for a time. No one would work for him ; no one would supply him with food. He and his wife had to work in their own fields themselves in most unpleasant imitation of Theocritian shepherds and shepherdesses, and play out their grim eclogue in their deserted fields with the shadows of armed constabulary ever at their heels. The Orangemen of the north heard of Captain Boycott and his sufferings and the way in which he was holding his ground, and they organized assistance, and sent him down armed laborers from Ulster. To prevent civil war, the authorities had to send a force of soldiers and police to Lough Mask, and Captain Boycott's harvests were brought in and his potatoes dug by the armed Ulster laborers guarded always by the little army."

If this is a correct picture, the thing we call a boycott originally signified violence, if not murder. If the defendants, in their hand-bills and circulars, used the word in its original sense, in its application to the Carrington Publishing Company, there can be doubt of their criminal intent. We prefer, however, to believe that they used it in a modified sense. As an importation from a foreign country, we

may presume that they intended it in a milder sense,—in a sense adapted to the laws, institutions, and temper of our people. In that sense it may not have been criminal. But even here, if it means,—as some high in the confidence of the trades union assert,—absolute ruin to the business of the person boycotted unless he yields, then it is criminal. Instances are not wanting in our own country whero the boycott has been attended with more or less violence; and it cannot be denied that the natural tendency is, especially when applied by the ignorant and vicious, to attempt to make it successful by force. It too often leads to serious disturbances of the peace, and even murder. We are loath, therefore, to assume that these defendants intended any such consequences. Nevertheless it is a dangerous instrumentality to use; and if those instigating and resorting to it do not of their own accord take notice of its peril, and voluntarily abandon its use, as we sincerely hope they will, the courts at no distant day will be called upon to recognize its dangerous tendency, and treat it accordingly.

From these considerations it is apparent that the purpose of this conspiracy, or the means by which it was to be accomplished, or both, were not only unlawful, but, as some authorities express it, "were in some degree criminal."

We have carefully examined the evidence in this case, and are of the opinion that it is sufficient to sustain the versdict. The only point which we regard as debatable is that relating to the purpose to demand money to pay the expenses of the boycott; but we think, on the whole, the jury were justified in finding the parties concerned were given to understand that they would be required to pay the expenses. As the boycott never reached such a stage as that such a demand could with propriety be made, there was no direct evidence that there was any intention to make it; but there were abundant intimations that such a demand would be made, and there can be little doubt that such a probability was distinctly presented as an inducement not to prolong the contest.

The declarations of one Kidd, who, as the evidence shows, was one of the conspirators, although not a defendant, were admitted in evidence, against the objection of the defendants. The declarations were made during the continuance of the conspiracy, and for the purpose, on the part of the conspirators, including Kidd, of carrying the same into full effect, and related to the way and manner by which the conspirators intended to accomplish their objects and purposes. What Kidd said was, in effect, that he did not believe the Carrington Publishing Company would fight them as the *News* did; that they would do the same as they had in the *News* case, and appeal to the merchants to take their advertisements out, and appeal to the subscribers, and that they would not do as they had done in the *News* case; but if they had another battle they would have to pay the expenses of the boycott. These declarations were made to one Skinner, a workman in the *Courier* office. At some time previous to the declarations in question, he had had an interview with Kidd and the defendant Glidden, at which they attempted to induce him to take part with the union in said controversy with the Carrington Company; in other words, to join the conspiracy. The declarations in question, following the efforts of Glidden and Kidd to win over Skinner, may well be regarded as supplementary to those efforts, and designed to make them successful; and so were acts in the prosecution of the object of the conspiracy, and as such were admissible.

As one of the means to carry the conspiracy into effect, the State claimed that Glidden distributed circulars like exhibit J; and, to prove that he did so distribute them, after offering evidence to prove that Glidden had been active in attempting to induce the public not to patronize the *Courier*, offered one Blackman as a witness, who testified that, on the most frequented street in New Haven, one evening he saw two persons passing, one of whom was said Glidden, and the other he did not know; that these two persons were walking up and down said street in company and close together,

and that from between them copies of the circular were from time to time dropped on the sidewalk, but the witness was unable to say which of said persons dropped them. The circular was as follows, in large letters: "A word to the wise is sufficient. Boycott the *Journal and Courier.*" To the admission of this circular the defendants objected. The court admitted it. We think it was properly admitted. Upon that evidence the jury might well find that Glidden distributed the circulars.

A proposed agreement was submitted to the *News* during the progress of the boycott on that paper by these defendants, or some of them, who were active in that transaction. When offered in evidence, it was objected to and admitted. It is now insisted that it is not admissible to prove that the defendants committed a similar offense for the purpose of proving that they committed the offense charged. That proposition is conceded. But we do not understand that the evidence was offered or received for any such purpose. These defendants were active in boycotting the *News.* In this transaction they frequently referred to that; and proclaimed their purpose to pursue the same general policy, including a demand that the expense should be paid. The effect of that was a threat, and understood as such by the parties. Assuming, as we do, that the parties also understood, in a general way, the details of the *News* boycott, they must also have understood just what they were to expect. In order that the jury may appreciate the full force of the threat, it is necessary to possess them, as far as may be, with the same knowledge. The better way to do that would seem to be to show what was done in that case. That disclosed the purposes and intention of the conspirators in the present case. By frequent reference to it as a precedent, they made the details of that, to some extent at least, relevant and material.

Exhibit L, which was a notice to the *News* that it would be charged $50 per week as its share of the expenses of the boycott, was admissible for the same reasons.

The State proved that the above-mentioned paper was submitted to the *News* by one Fowler. During that interview, the subject-matter of the *News* paying the $500 was talked over between the said committee and Fowler. It further appeared that Glidden and Mulcahy personally were not in favor of pressing the money demand, but the committee finally concluded to let it stand. On the cross-examination of Fowler his attention was called to another interview between him and Glidden, which took place subsequently, and to which the State, on the direct examination, had not referred or alluded; and the witness was asked to state what Glidden at such different and subsequent interview said upon this subject of money demand from the *News*. This inquiry was objected to and excluded. That ruling was clearly correct.

One Mailhouse, one of the conspirators, but not a defendant, was offered as a witness by the State, but declined to testify, on the ground that his testimony would tend to criminate himself. The State then offered Judge Denning as a witness to prove what Mailhouse had sworn to on the trial of another case before the city court. His testimony was received against the defendants' objection. The substance of the testimony was that he (Mailhouse) printed some circulars used by the defendants in this case during the existence of said claimed conspiracy, and while it was being carried on, and in furtherance thereof. This testimony was objected to, ruled in, and exception taken. The import of the finding is, that this testimony was offered for the purpose of proving the fact that Mailhouse printed the circulars. The objection being general, perhaps it may fairly be inferred that it was on the ground that that fact was not relevant. If so, the objection is without foundation. It may have been on the ground that it was not competent to prove the fact by the admission of a conspirator who was not a party. But the record discloses no such ground of objection, and counsel for the defense do not allude to it in their brief. As that question has not been dis-

cussed, we will not consider it.   The only other reason for
objecting to it seems to be that the testimony of Mailhouse,
before the city court, was not admissible as to the declara-
tion of a co-conspirator.   That is the only question that has
been discussed, and we must assume that it is the only one
the defense intended to raise.   Assuming that the defend-
ants are right in this, still they are not entitled to a new
trial, because, as we interpret the record, the testimony was
not offered for the purpose of proving a mere declaration,
but for the purpose of proving the fact that Mailhouse
printed the circulars.   That is apparent from the fact that
Mailhouse was first offered as a witness.   He would hardly
have been offered for the purpose of proving his own declara-
tion, as any other witness could have sworn to it just as well.
He was manifestly offered to prove that he printed the cir-
culars.

The State offered one Bertha Palm as a witness, who
testified, against the general objection of the defendants,
that she overheard a conversation between five or six
printers, members of the union, among whom was the de-
fendant Mulcahy, the others not identified, in which it was
stated, but by whom she could not say, that they were pay-
ing 50 cents a week for the expenses of the *Courier* boycott,
and that it would be paid for by the *Courier*.   On objection
by defendants, the court ruled that this evidence was ad-
missible.   We are inclined to think that this ruling was
correct.   The boycott was inaugurated and prosecuted by
Typographical Union No. 47.   Here were five or six of the
members of that union, including Mulcahy, conversing on
the subject of the boycott, and one of them remarked that
they were paying money to support it, and that it would be
paid for by the *Courier*.   From the facts, that these men
were members of the union, in connection with the further
fact that, by the statement then and there made, they were
promoting the boycott by the payment of money, it is not
going too far to assume that these men were parties to the
conspiracy, and so their declarations were admissible, not

only against Mulcahy, but the other defendants as well. Mulcahy was a party to that conversation, and presumptively he heard the remark. · He made no reply, and thereby assented to its truth.  We think it tended to show that Mulcahy understood and intended that the *Courier* should be required to pay the expenses of the boycott.

There is no error, and a new trial is denied.

The other justices concurred.

---

NOTE.—See People *ex rel.* Gill *v.* Walsh, *supra*, page 292, and. note to next case, Crump *v.* Commonwealth, at page 361, *infra*.